UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| | |
|---|---|
| Paul M. Cruz | N/A |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF Nos. 91, 93]

## I. Introduction

Before the Court are cross motions for summary judgment filed by Plaintiff the M.I.B. Group, LLC and Defendants MIB-Shield LLC dba MIB Security Group and Steven R. Aguilar. For the following reasons, Defendants' motion is DENIED and Plaintiff's motion is GRANTED IN PART and DENIED IN PART.

## II. Background[1]

[1] All facts are undisputed unless otherwise stated and are derived from the parties' briefs and supporting materials. Nothing in

: 

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

The parties are intimately familiar with the facts of this case, having already participated in a two-day trial before the Court. But for the orientation of readers, the Court offers the following summary.

Plaintiff The M.I.B. Group, LLC ("Plaintiff" or "MIB Group") is a California limited liability company which provides private security services. Pl.'s Reply to Defs.' Opp'n to Pl.'s Separate Statement of Uncontroverted Facts ("UF") 66, ECF No. 112. Plaintiff is exclusively owned and operated by Tyrone Wilkerson ("Wilkerson"). UF 2.

Defendant MIB-Shield LLC ("MIB Shield"), doing business as MIB Security Group, is a Nevada limited liability company which provides private security services. UF 3. MIB Shield is exclusively owned and operated by Steven R. Aguilar ("Aguilar," and collectively with MIB Shield, "Defendants"). UF 4.

Wilkerson began working in the private security industry in 1992–93. Trial Tr. April 16, 2024, at 40:6–25, ECF No. 106. Over time, he worked for various private security firms and received several licenses from the California Bureau of Security and Investigative Services ("BSIS"). *Id.* 40:16–43:24. Wilkerson has used the acronym "M.I.B."—standing for Men in Black[2]—to describe his services since at least 2002. *Id.* at 44:5–7. Often, M.I.B. is accompanied by a logo depicting a crosshairs/bullseye design. *Id.* at 80:22–81:5. Wilkerson has a penchant for conspicuously displaying 'M.I.B.' and its affiliated crosshairs logo; he has placed them on leather jackets and custom cars, and he has even tattooed the logo on his neck. *Id.* at 45:13–49:3. The 'M.I.B.' acronym has also provided the name to numerous business entities which Wilkerson has owned and operated, including M.I.B. 220, Inc. and M.I.B. 2nd II None, Inc. *Id.* at 49:16–50:9. Wilkerson's most recent business entity, founded in August 2015, is the Plaintiff in this case. Defs.' Ex. 4 to Mot. for Summ. J. ("Wilkerson Dep.") 83:7–16, ECF No. 97.

this section should be construed as a factual finding; rather, this section is merely background information regarding the instant lawsuit. "To the extent certain facts or contentions are not mentioned in this Order, the Court has not found it necessary to consider them in reaching its decision." *Sarieddine v. Vaptio, Inc.*, 2021 WL 4731341, at *1 (C.D. Cal. June 15, 2021).

[2] 'Men in Black' is a reference to the film series starring Will Smith and Tommy Lee Jones. The two actors play government agents who safeguard the Earth from extraterrestrial beings. Trial Tr. April 16, 2024, at 49:5–7, ECF No. 106.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

Aguilar began his career in law enforcement in 1994. Trial Tr. April 16, 2024, at 103:3–21, ECF No. 106. During that time, Aguilar worked for the Compton Police Department, the L.A. County Sheriff's Department, and what is now the U.S. Customs and Border Patrol. *Id.* Aguilar met Wilkerson in 1996 and obtained a security guard license in 1999. *Id.* at 103:22–104:6. Aguilar began working for Wilkerson on a part-time basis in 2002, while continuing to work as a law enforcement officer. *Id.* 104:10–14.

In late 2006, Aguilar approached Wilkerson with information about a potential contract based in Lompoc, California. Trial Tr. April 16, 2024, at 50:25–54:20, ECF No. 106. That contract involved providing security services to the Celite Corporation.[3] *Id.* Wilkerson described the contract as being worth "an outrageous amount of money." *Id.* at 52:16. In recognition for the fact that Aguilar sourced the contract and because Wilkerson did not want to constantly commute to Lompoc, Wilkerson let Aguilar manage the account and the two individuals split the profits evenly. *Id.* at 52:9–53:5. During this period, Wilkerson and Aguilar were "close friend[s]." UF 13.

In November 2008, Aguilar registered the domain name "mibsecuritygroup.com" (the "Website") Trial Tr. April 17, 2024, at 19:15–20:23, ECF No. 107. The Website listed several of Wilkerson's security licenses, as well as a license affiliated with Aguilar. *Id.* at 24:19–26:4. The Website also contained numerous references to Wilkerson's various MIB business organizations. *Id.* at 26:5–27:7. After a two-day trial, a jury found that Aguilar "was acting as an employee of M.I.B. 220 Inc. or M.I.B. 2nd II None, Inc. at the time he registered the domain name 'mibsecuritygroup.com.'" Verdict Form, ECF No. 84.

In 2012, the State of California revoked all but one of Aguilar's security licenses. Trial Tr. April 17, 2024, at 36:2–4, 37:20–38:4, ECF No. 107. Nevertheless, Aguilar continued working with Wilkerson for several years.

In June 2015, Wilkerson and Aguilar had a dispute which resulted in the termination of their business relationship. At trial, Aguilar disputed that the two men had fallen out; he stated that they "were

[3] The Celite Corporation is now known as Imerys, S.A.

: 

Initials of Preparer PMC

just having some differences," but "continued to stay friends." Trial Tr. April 17, 2024, at 30:1–3, ECF No. 107. Wilkerson disagreed. He stated that the two had fallen out after he discovered that Aguilar was distributing business cards which falsely identified Aguilar as the owner-operator of Wilkerson's company; moreover, these cards allegedly used Wilkerson's security license numbers without permission. Trial Tr. April 16, 2024, at 73:22–74:23, ECF No. 106. Regardless of how one characterizes the incident, the two men severed their professional relationship in June 2015. Wilkerson wrote the following to Aguilar in an email:

> Mr. Aguilar, This email is to confirm what has already been verbally stated on 6/8/15 .. That you are no longer allowed to function under any of my licenses.. Such as MIB Executive Protection, The Men in Black Group Investigations , Top Gun Training Facility.. I also need you to return any business cards that have any of my company names & license info on it.. Also I am requested the codes to my web site to have your information removed. There will be another letter to follow up on this issue.. I appreciate your cooperation on the above mentioned issues..!!

Kinder Decl., Ex. 57 (Wilkerson & Aguilar Email Thread), ECF No. 93-3. Aguilar responded with the following message:

> I do not agree as we spoke and have communicated to finishing this pending contract. I will diss associate any further MIB functions thereafter as were already committed As we discussed.
>
> Your deciding not to assist was your choice.
>
> As for the other issues yes we will resolve ASAP.

*Id.*[4] Wilkerson responded with the following message: "I turned down agreement and fired you on

[4] The contract referenced in these emails was a potential business opportunity sourced by Aguilar, which he wanted to perform under Wilkerson's license. Trial Tr. April 17, 2024, at 40:20–23, ECF No. 107.

6/8/2015.. Live with it…" *Id.* Aguilar then wrote: "Ahh no. We had this discussion. And agreed to fulfill obligations." *Id.* Aguilar never turned over control of the website to Wilkerson. Trial Tr. April 17, 2024, at 44:23–45:3, ECF No. 107.

Subsequently, Wilkerson and Aguilar each continued to separately provide private security services. Wilkerson incorporated the Plaintiff in this case, M.I.B. Group, LLC, in August 2015. Wilkerson Dep. 83:7–16. Still without access to the Website, Wilkerson registered several alternate web domains, including "mibsecurity.net" and "mibgrouppi.com." Wilkerson Decl. ¶¶ 22–23, ECF No. 93-4. On August 18, 2015, Aguilar "filed a fictitious business name statement for MIB Security Group." Defs.' Mot. for Summ. J., Aguilar Decl. ¶ 6, ECF No. 91. Aguilar then incorporated MIB-Shield, LLC, on February 17, 2017; Aguilar continued operating under the business name MIB Security Group. *Id.* ¶ 7.

Under Aguilar's control, the Website was changed in August 2015 to remove all references to Wilkerson's licenses. Trial Tr. April 17, 2024, at 48:13–21, ECF No. 107. Otherwise, the Website remained largely the same as it had before. That changed when Aguilar had the Website redesigned in the first half of 2021,[5] shortly after receiving a Private Patrol Operator license.[6] *Id.* at 49:18–50:21. Wilkerson claims that this redesign of the Website prompted him to take legal action against Aguilar. Wilkerson Decl. ¶¶ 25–37, ECF No. 93-4.

On July 19, 2021, and September 10, 2021, Wilkerson (on behalf of Plaintiff) applied to register two trademarks with the United States Patent and Trademark Office (USPTO). Wilkerson Decl. ¶¶ 29–34, ECF No. 93-4. Those registrations issued on August 9, 2022. Kinder Decl., Ex. 2 (Registration for MIB Group Logo in Crosshairs, No. 6,812,698), Ex. 3 (Registration for Word Mark MIB Security Group, No. 6,814,995), ECF No. 93-3. The MIB Logo with Crosshairs is reproduced below:

---

[5] The current Website design as of July 15, 2024, is archived at the following URL: https://perma.cc/QD52-KX9L.

[6] "A Private Patrol Operator licensee operates a business that protects persons or property or prevents theft." California Bureau of Security and Investigative Services, *Private Patrol Operator or Qualified Manager Factsheet*, https://www.bsis.ca.gov/forms_pubs/ppo_fact.shtml (https://perma.cc/2FUQ-8XNR).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

On July 17, 2023, Aguilar filed a petition with the Trademark Trial and Appeal Board (TTAB) to cancel Plaintiff's trademark registrations. Plaintiff filed this suit on August 9, 2023. Compl., ECF No. 1. The TTAB then suspended Aguilar's cancellation petition pending the resolution of the present case. Opp'n to Mot. to Stay, Ex. D (Sept. 5, 2023, TTAB Suspension Notice), ECF No. 33. Defendants filed an answer and counterclaim in this case on October 9, 2023. ECF Nos. 14, 15. The Court held a two-day jury trial on April 16–17, 2024, on the narrow question of whether Aguilar was working as an employee of Wilkerson at the time that he registered the Website. ECF Nos. 78, 79. The jury found that Aguilar had been working as an employee of one of Wilkerson's companies when he did so. Verdict Form, ECF No. 84. The parties submitted the present cross-motions for summary judgment shortly thereafter. ECF Nos. 91, 93.

## III. Legal Standard – Motion for Summary Judgment

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of . . . [the factual record that] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its initial burden, the non-moving party must demonstrate with admissible evidence that genuine issues of material fact exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)

:

Initials of Preparer PMC

("When the moving party has carried its burden under Rule 56 . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). "On an issue as to which the nonmoving party will have the burden of proof . . . the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

A material fact for purposes of summary judgment is one that "might affect the outcome of the suit" under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although a court must draw all inferences from the facts in the non-movant's favor, *id.* at 255, when the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, [the] court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremukun*, 509 F.3d at 984.

## IV. Evidentiary Objections

Defendants have made evidentiary objections to Wilkerson's declaration, which was submitted alongside Plaintiff's motion for summary judgment. Defs.' Objs. to Evid. Submitted by Pl., ECF No. 100.

Many such objections allege that the evidence is not relevant. These objections misunderstand the summary judgment standard. "A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). All relevance objections are therefore OVERRULED. Similarly, many objections are made under the rule of completeness. But the rule of completeness is a rule of evidentiary admissibility; it "applies only where the omitted portion of a statement is 'necessary to explain the admitted portion, to place the admitted

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *United States Sec. Holdings v. Andrews*, No. CV 21-2263 DSF (MRWx), 2021 U.S. Dist. LEXIS 253321, 2021 WL 6882436, at *12–13 (C.D. Cal. Dec. 24, 2021) (citing *United States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009)). Wilkerson's full declaration has been admitted already; rule of completeness objections to statements made therein are inappropriate. All such objections are OVERRULED.

Defendants also make numerous foundation objections to statements in Wilkerson's declaration relating to his various M.I.B. corporations. "Rule 56 requires that, before evidence can be considered on summary judgment, a proper foundation must be laid." *Bd. of Trs. of the Cal. Winery Workers' Pension Tr. Fund v. Giumarra Vineyards*, No. 1:17-cv-00364-SAB, 2018 U.S. Dist. LEXIS 34663, 2018 WL 1155988, at *8 (E.D. Cal. Mar. 2, 2018) (citing *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007)). As the sole owner-operator of these businesses, Wilkerson is clearly knowledgeable enough to testify about their operations. Foundation objections related to Wilkerson's statements regarding Defendants' business (e.g., that both Plaintiff and MIB Shield require their employers to wear patches on their uniforms identifying their employer) are well-taken and SUSTAINED.

Defendants also make hearsay objections to statements in Wilkerson's declaration that he received misdirected communications from individuals attempting to reach Defendants. These objections are discussed in Section V-C-4 *infra* as part of the Court's likelihood of confusion analysis.

All other objections, such as those addressed towards statements Wilkerson made regarding orally transferring his trademark rights from one corporation to another, are OVERRULED as moot "because the Court does not rely on that evidence in ruling on this motion." *Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.*, No. 2:11-cv-8557-CAS(DTBx), 2014 U.S. Dist. LEXIS 5383, 2014 WL 172516, at *8 (C.D. Cal. Jan. 14, 2014).

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

## V. Discussion

### A. Defendants Fail to Meet Their Burden to Invalidate Plaintiff's Registered Trademarks

Plaintiff currently holds two registered trademarks. Kinder Decl., Ex. 2 (Registration for MIB Group Logo in Crosshairs, No. 6,812,698), Ex. 3 (Registration for Word Mark MIB Security Group, No. 6,814,995), ECF No. 93-3. Defendants seek to cancel these registrations. Because a registered mark conveys certain benefits on its registrant, the Court begins its analysis here.

"A party who believes he has been harmed by a trademark's registration may seek the cancellation of that trademark's registration on certain specified grounds, including that the trademark was obtained by the commission of fraud on the United States Patent and Trade Office (USPTO)." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing 15 U.S.C. §§ 1064, 1119). "To succeed on a claim for cancellation based on fraud, [the moving party] must adduce evidence of (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Id.* (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)). "A false representation in the original trademark application or an affidavit accompanying a renewal application may be grounds for cancellation if all five requirements are met." *Id.* (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 20:58 (4th ed. 2005)). A party moving to cancel a registered trademark bears "a heavy burden." *Id.*

Defendants move for summary judgment on their counterclaim to cancel Plaintiff's registered trademarks. Their theory is that Wilkerson engaged in a "deliberate attempt to mislead the USPTO" by misstating the date of first use on his trademark applications. Defs.' Mot. for Summ. J. 23–26, ECF No. 91. Defendants argue that there is no evidence in the record that Wilkerson used the mark "MIB Security Group" before January 16, 2019, despite claiming to have first used the mark in January 2002 on his trademark registration. *Id.* at 24–25. Likewise, Defendants argue that Wilkerson has produced no evidence

:

Initials of Preparer PMC

of having used the "MIB in Circle" mark before 2014 or 2015, despite claiming in his trademark registration application to have first used the mark on January 2, 2002. *Id.* at 25–26.

Defendants' argument fails as a matter of law. The Ninth Circuit ruled that "[t]he claim of a date of first use is not a material allegation as long as the first use in fact preceded the application date." *Pony Express Courier Corp. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989) (citing *CarX Service Systems, Inc. v. Exxon Corp.*, 215 U.S.P.Q. (BNA) 345, 351 (1982); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:21 at 610 (2d ed. 1984)); *see also Teeter-Totter, LLC v. Palm Bay Int'l, Inc.*, 344 F. Supp. 3d 1100, 1109 (N.D. Cal. 2018). Here, there is no doubt that Wilkerson used the marks in question before filing the registration applications; Defendants' argument acknowledges that both registered marks were used by Plaintiff before Plaintiff's registration in 2021.

Defendants carried a heavy burden to invalidate Plaintiff's registered marks, and their argument in favor of cancellation fails as a matter of law. The Court therefore will not invalidate Plaintiff's marks. Defendants' motion for summary judgment on their cancellation claim is DENIED.

### B. Plaintiff Has Standing to Pursue Trademark Claims for Both Its Registered and Unregistered Marks

"To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) (citing 15 U.S.C. §§ 1114(1), 1125(a); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:20-21, 32:3, 32:12 (4th ed. 2008)).

#### 1. Registered Marks

"A certificate of registration of a mark upon the principal register provided by this Act shall be

prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." 15 U.S.C. § 1057(b). The presumption of ownership conferred by registration dates "to the filing date of the application for federal registration." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). "However, the non-registrant can rebut this presumption by showing that the registrant had not established valid ownership rights in the mark at the time of registration - in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Id.*

Defendants seek to rebut the presumption that Plaintiff owns its registered marks. To do so, they point to deposition testimony from Wilkerson in which he states that he "did [not] know when, how, or if MIB Group became the owner of the registered marks, which is an essential element of the claim for trademark infringement." Defs.' Mot. for Summ. J. 18, ECF No. 91. Wilkerson's knowledge (or lack thereof) regarding how Plaintiff came to possess trademark ownership rights is irrelevant to the presumption of ownership conferred by Plaintiff's registration of the marks. The proper way for Defendants to rebut this presumption would be to introduce evidence that they used the mark in question first. Defendants cannot do so because Wilkerson indisputably used the marks before them. The Court "grant[ed] partial summary judgment for the [P]laintiff on the question of their first using the trademark M.I.B., M.I.B. Group, and M.I.B. with the crosshairs logo, either as three separate trademarks or as one." Defs.' Opp'n to Pl.'s Mot. for Summ. J., Ex. A (Trial Tr. Apr. 16, 2024—A.M. Session), 37:9–13, ECF No. 98-7. That finding precludes an ownership challenge to the MIB Group in Crosshairs mark (No. 6,812,698). The jury's finding that Aguilar created the Website, which used the domain name "mibsecuritygroup.com," in 2008 as an employee of one of Wilkerson's companies likewise establishes that Wilkerson used that mark before Defendants.

Defendants have failed to rebut the presumption of ownership in the registered marks conferred by those marks' successful registration. The Court therefore presumes that Plaintiff owns the registered marks in question dating back to the filing of its registration applications on July 19, 2021, and September

:

Initials of Preparer PMC

10, 2021.

### 2. Unregistered Marks

Defendants argue that Plaintiff lacks standing to pursue its common law trademark claims against Defendants because Plaintiff "does not explain how MIB Group acquired ownership rights" in those common law marks that existed before Plaintiff's incorporation. Defs.' Opp. to Pl.'s Mot. for Summ. J. 7, ECF No. 98. Defendants' argument is based on two key facts: (1) Plaintiff alleges that its common law marks date back to 2002, and (2) Plaintiff was incorporated in 2015. Based on those facts, Defendants' "motion raise[s] the following arguments: (1) Wilkerson testified at deposition as the person most qualified under Rule 30(b)(6) for MIB Group that he personally owned the registered and unregistered marks in 2002, but did not recall how he transferred the rights to the MIB Group; (2) the evidence submitted for trial (i.e., the trial exhibits) cannot support MIB Group having standing to pursue the claims for the unregistered marks; and (3) the presumption of ownership of the registered marks was properly challenged, so the burden of proof shifts to MIB Group to demonstrate it has standing." *Id.* at 7–8. Simplified, Defendants argue that there is no evidence that Plaintiff ever received ownership of the common law marks; ergo, Plaintiff has no standing to sue on the basis of those marks. *See generally* Defs.' Trial Br. on the Bifurcated Issues, ECF No. 72.

Plaintiff instead argues that it has "proven a clear chain of title to both the underlying common law and registered trademark rights at issue herein. Specifically, Plaintiff established the chain of title from MIB 220, Inc. to MIB 2nd II None, Inc. to Mr. Wilkerson personally and then ultimately to Plaintiff upon formation." Pl.'s Opp. to Defs.' Mot. for Summ. J. 9, ECF No. 101.

"Usually, a corporation is regarded by the law as a legal entity separate and distinct from its stockholders, officers and directors." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:36 (5th ed. 2024). "If a corporation is using a mark, then a principal officer and shareholder is not the 'owner.'" *Id.* "It is presumed, however, that a real person who owns all the stock of a corporation controls the corporation so that use of the mark by the corporation inures to the benefit of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

the real person, who is presumed to be the 'owner' of the mark." *Id.*; *see also In Re Hand*, 231 U.S.P.Q. 487, 488 (T.T.A.B. 1986) ("We agree with applicant herein that the reasoning whereby it is deemed sufficient for a corporation to claim that it owns a mark being used by a wholly-owned subsidiary should apply equally in the case where an individual claims ownership of a mark based on use by a wholly-owned related company."); *Ducommun v. Jaiswal*, 2023 TTAB LEXIS 495, *13 (Trademark Trial & App. Bd. November 13, 2023) (citing *In re Hand*, 231 USPQ at 488) ("Where the facts demonstrate that an individual owns a corporation, and the ownership is so complete that 'the two legal entities "equitably constitute a single entity," then the individual will be found in sufficient control of the mark such that use by the corporation inures to the benefit of the individual.'").

The record contains evidence that Wilkerson owned and operated a variety of similar business associations over time. Wilkerson incorporated MIB 220 Inc. ("MIB 220") on October 12, 2001. Defs.' Ex. 4 to Mot. for Summ. J. ("Wilkerson Dep.") 60:17–24, ECF No. 97. Wilkerson was the sole shareholder of MIB 220. *Id.* at 60:25–61:2. MIB 220 was subsequently suspended due to its failure to pay payroll taxes in 2009–2010. *Id.* at 76:21–78:22. Later, Wilkerson incorporated MIB 2nd II None, Inc. ("MIB 2nd") for "[b]anking purposes."[7] *Id.* at 82:16–17. Once again, Wilkerson was the sole shareholder of MIB 2nd. *Id.* at 81:4–8. MIB 2nd became inactive at some point; Wilkerson claimed he did not remember "why [he] let that corporation go," but knew "[i]t wasn't a tax situation." *Id.* at 81:24–82:7. Wilkerson then created the MIB Group, LLC (the plaintiff in the present case) in August 2015. *Id.* at 83:7–16. It is undisputed that the MIB Group, LLC is exclusively owned and operated by Wilkerson. UF 2. In the intervening period between MIB 220 and MIB 2nd going inactive and the formation of MIB Group, Wilkerson worked as a "dba" without the "added protection" of a business association. *Id.* at 83:14–16. Wilkerson's persistent sole ownership of these corporations across time means that Wilkerson owns the marks used by these corporations.

Wilkerson, however, is not a party to this lawsuit; MIB Group is the sole plaintiff. But the Court

[7] When asked for clarification, Wilkerson qualified this statement by adding "I don't really remember why I created this, to be honest with you, no." Wilkerson Dep. 82:20–21.

:

Initials of Preparer PMC

sees no reason to limit the application of this sole ownership principle to only flow in a single direction. If Wilkerson can own a trademark because he is the sole owner of the corporation that uses that mark, then a corporation wholly owned by Wilkerson should likewise have standing to claim an ownership interest in his mark. At the very least, MIB Group constitutes "a nonowner with a cognizable interest in the allegedly infringed trademark," which puts it into the final category of entities possessing standing to sue for trademark infringement.[8] *See Halicki*, 547 F.3d at 1225. Trademark law tolerates a fluidity in ownership rights between individuals and their wholly owned business associations. For that reason, the Court rejects Defendants' argument; Plaintiff has standing to pursue its infringement claims for these unregistered marks.

### C. No Reasonable Jury Could Fail to Find a Likelihood of Confusion

The Court's trademark analysis focuses primarily on Defendants' use of "MIB Security Group." Use of this mark is analyzed in relation to Plaintiff's various "M.I.B." marks, but, for analytical convenience, the Court focuses on "MIB Group."[9]

[8] In its briefs, Plaintiff posits an unnecessary hypothetical which the Court rejects. *See* Pl.'s Opp. to Defs.' Mot. for Summ. J. 14, ECF No. 93 ("Indeed, even if Mr. Wilkerson wanted to argue that Plaintiff was ***not*** the owner of the common law rights (i.e., that Mr. Wilkerson was the owner instead), the law would preclude Mr. Wilkerson from asserting such an argument because it ***presumes*** that Plaintiff is the owner of the earlier common law rights.") (emphasis in original). Plaintiff's theory is that Wilkerson's incorporation of MIB Group transferred his entire business, including common law trademarks, to that entity. Plaintiff's theory rests on *Am. Sleek Craft, Inc. v. Nescher*, 131 B.R. 991, 997 (D. Ariz. 1991), which is not binding precedent on this Court. Moreover, that case based its analysis on a 1912 D.C. Circuit bankruptcy case, *Jackson Corset Co. v. Cohen*, 38 App. D.C. 482 (1912). In *Jackson Corset*, "an individual created and used a trademark in connection with his business for many years, and then formed a corporation and became its president. The individual transferred his business to the corporation, which continued to manufacture the same goods. There was no formal transfer of the trademark. The corporation subsequently became bankrupt, and the president . . . argued that he had licensed the trademark to the corporation. The court rejected the argument . . . ." *Nescher*, 131 B.R. at 997. Both *Jackson Corset* and *Nescher* concerned situations in which a corporate owner attempted to convince courts that they had retained all significant assets while saddling a corporation with only liabilities; importantly, both plaintiffs were making that argument in a bankruptcy proceeding. Those circumstances are not present here and the Court declines to borrow that analysis.

[9] Alternatively, the record contains ample evidence that Wilkerson used "MIB" consistently across decades, in a way that constitutes a "family" of marks. *See* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:61 (5th ed.).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

"The touchstone for trademark infringement is likelihood of confusion, which asks whether a 'reasonably prudent' marketplace consumer is 'likely to be confused as to the origin of the good or service bearing one of the marks.'" *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) (citing *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012)). *See also M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) ("The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion.") (citing *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)).

This inquiry is guided by the "well-established" *Sleekcraft* factors. *Stone Creek*, 875 F.3d at 431 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)). When evaluating the *Sleekcraft* factors, "courts do not merely count beans or tally points." *Id.* (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)). "Not all factors are created equal, and their relative weight varies based on the context of a particular case." *Id.* (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011)).

The *Sleekcraft* factors are as follows: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *Sleekcraft*, 599 F.3d at 348–49. Factors 2 and 3 (proximity of the goods and similarity of the marks, respectively) are "particularly probative." *Stone Creek*, 875 F.3d at 432 (citing *Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256–57 (9th Cir. 1986)).

"Although disfavored in trademark infringement cases, summary judgment may be entered when no genuine issue of material fact exists." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005), *superseded by statute on other grounds* (citing *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901–02 (9th Cir. 2002)).

:

Initials of Preparer PMC

In its motion for summary judgment, Plaintiff argues that it has shown a likelihood of confusion as a matter of law pursuant to the *Sleekcraft* factors. Defendants oppose the motion on each factor.[10] The Court therefore evaluates them in turn.

**1. The Parties Have Stipulated that MIB is Inherently Distinctive, Which Supports a Likelihood of Confusion**

"Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *M2 Software*, 421 F.3d 1073, 1080 (9th Cir. 2005) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most distinctive." *Id.* (citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)). "The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness." *Id.* "The stronger a mark — meaning the more likely it is to be remembered and associated in the public mind with the mark's owner — the greater the protection it is accorded by the trademark laws." *Network Automation*, 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999)).

Suggestive marks are "deemed inherently distinctive and are entitled to protection." *Two Pesos*, 505 U.S. at 768. Because they sit in the middle of the "conceptual distinctiveness spectrum," suggestive marks are entitled to more protection than distinctive marks but less protection than arbitrary marks. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014). This middle-of-the-spectrum positioning leaves suggestive marks "still 'presumptively weak.'" *Id.* (quoting *Brookfield*, 174 F.3d at 1058). But a suggestive mark can be strengthened by factors such as extensive advertising, length of

[10] Defendants' summary judgment motion further argues that Plaintiff has failed in its burden for the sole reason that the record does not contain evidence of actual confusion. Def.'s Mot. for Summ. J. 19, ECF No. 91 ("The problem is that all the complaints are based upon hearsay, and Wilkerson did not produce any documents to support the likelihood of the confusion element, and as such, this element cannot be satisfied."). No single *Sleekcraft* factor is determinative. "Evidence of actual confusion is strong evidence that future confusion is likely, . . . but the absence of such evidence is not dispositive." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (citing *Nutri/System, Inc. v. Con-Stan Indus.*, 809 F.2d 601, 606 (9th Cir. 1987); *Eclipse Assocs. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)). This argument fails.

exclusive use, and public recognition. *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).

Here, M.I.B. (which stands for Men in Black) is a suggestive mark because an imaginative leap is required to get from the notion of men wearing black clothing to security services. The fact that the Men in Black mark is often abbreviated as M.I.B. does not alter this analysis. *See Ricks v. BMEzine.com, LLC*, 727 F. Supp. 2d 936, 962 (D. Nev. 2010) (explaining that the fact that a consumer must take an imaginative leap to comprehend what an acronym is abbreviating does not make a mark distinctive). Moreover, the parties here have stipulated that the "M.I.B." acronym is an inherently distinctive mark. Pl.'s Mot. for Summ. J. 11, ECF No. 93.

The conceptual strength of the "M.I.B." mark is undisputed. For that reason, this factor supports a likelihood of confusion.

**2. The Proximity of the Goods Supports a Likelihood of Confusion**

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Network Automation*, 638 F.3d at 1150 (quoting *Brookfield*, 174 F.3d at 1055). "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation*, 638 F.3d at 1150 (citing *Sleekcraft*, 599 F.2d at 350). Put another way, "[g]oods are proximate if consumers are 'likely to associate' the two product lines." *Mercer Glob. Advisors, Inc. v. Hewitt*, No. CV 23-3659-GW-JPRx, 2023 U.S. Dist. LEXIS 140817, at *10 (C.D. Cal. Aug. 11, 2023) (quoting *Surfvivor*, 406 F.3d at 633).

Defendants argue that "[a] factual dispute exists as to whether MIB Group and MIB Security Group compete with each other, have similar customers or provide similar services." Def.'s Opp'n to Pl.'s Mot. for Summ. J. 14, ECF No. 98. Defendants base this argument on a portion of Aguilar's deposition in which Aguilar stated that he does not know what security services Wilkerson performs anymore, so the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

two men therefore "do not" target "the same types of customers." Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. C (Aguilar Dep.) 119:3–15, ECF No. 98-9. These statements contain an obvious logical deficiency: if Aguilar does not know what services Wilkerson provides, he cannot know whether they target the same types of customers. The only concrete difference which Aguilar identified was that Wilkerson "mostly did nightclub security and [Aguilar does not] do any of that." *Id.* at 119:12–13. Aguilar defined his services as "[m]ostly executive protection. Private investigations. And entertainment, the concert services." *Id.* at 120:23–25. Aguilar then further defined concert services as "swap meets." *Id.* at 121:1–2.

Plaintiff instead argues that the services offered are identical and that M.I.B. Group and MIB Shield are direct competitors. Pl.'s Reply ISO Mot. for Summ. J. 12, ECF No. 111. In support for this argument, Plaintiff cites the following statement made by Aguilar in his deposition: "[E]very security company out there is a competitor." Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. C (Aguilar Dep.) 118:25–119:1, ECF No. 98-9.

Here, the goods in question (security services) are unquestionably complementary and similar in use and function. There is some uncertainty regarding whether M.I.B. Group and MIB Shield target the same group of customers. Regardless, the Court has little difficulty concluding that consumers are "likely to associate" the two services. *Surfvivor*, 406 F.3d at 633 (quoting *Dreamwerks*, 142 F.3d at 1131). The Ninth Circuit has held far more divergent goods to be proximate. *Dreamwerks*, 142 F.3d at 1131 ("[M]ovies and sci-fi merchandise are . . . as complementary as baseball and hot dogs."); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963) (finding that beer and Scotch whiskey are proximate goods because both are "within the alcoholic beverage industry"). Even if M.I.B. Group and MIB Shield offer security services for different types of customers and events, their underlying work is sufficiently similar that a customer would likely be confused.[11] Accordingly, this *Sleekcraft* factor supports a likelihood of confusion.

[11] The Court does not go so far as to say that all security services are proximate goods. One could imagine that neither MIB Group nor MIB Shield offers a proximate service to a private military contractor, for example. But on this record, the difference between offering security services to swap meets and night clubs is negligible.

:

Initials of Preparer PMC

### 3. The Similarity of the Marks Strongly Supports a Likelihood of Confusion

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351 (citing *Plough, Inc. v. Kreis Laboratories*, 314 F.2d 635, 638 (9th Cir. 1963)). "[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Brookfield*, 174 F.3d at 1054 (citing *Dreamwerks*, 142 F.3d at 1131; *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993)). "Similarities are weighed more heavily than differences." *Goss*, 6 F.3d at 1392 (citing *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1219 (9th Cir. 1987)). "Marks should be considered in their entirety as they appear in the marketplace . . . ." *Entrepreneur Media*, 279 F.3d at 1144.

While similarity of the marks "will always be important," it is not inherently dispositive. *Brookfield*, 174 F.3d at 1045. "Even where there is precise identity of a complainant's and an alleged infringer's mark, there may be no consumer confusion - and thus no trademark infringement - if the alleged infringer is in a different geographic area or in a wholly different industry." *Id.* (citing *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 515-16, 521-22 (C.C.P.A. 1980)).

Here, the Court need not belabor the point that the marks in question are similar; this conclusion is obvious and indisputable. Plaintiff owns a registration, which Defendants tried and failed to cancel, in "MIB Security Group." Even if the Court had cancelled that registration, Defendants could only argue that Plaintiff's various other marks are not precisely identical because Plaintiff does not always use the word 'security.' Defs.' Opp. to Pl.'s Mot. for Summ. J. 15, ECF No. 98. But similarities here are weighed more heavily than differences. Both marks are centered around MIB. Because Plaintiff and Defendants are both in the business of providing security services, the insertion of the word 'security' is merely either descriptive or generic. *See JL Bev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016) ("Descriptive marks define a particular characteristic of the product in a way that does not require any imagination, while generic marks describe the product in its entirety and are not entitled to trademark protection."). The addition of a descriptive word can hardly create a meaningful distinction between two otherwise identical marks. Additionally, there is evidence in the record that Defendants at some point

previously used a stylized crosshairs logo in association with MIB.[12] Kinder Decl., Ex. 9 (Wayback Machine archives of Plaintiff's and Defendants' websites), ECF No. 93-3. The marks in question are unquestionably similar when evaluated for sight, sound, and meaning. This factor strongly weighs in favor of finding a likelihood of confusion.

**4. The Absence of Evidence of Actual Confusion is Neutral**

"Evidence of actual confusion is strong evidence that future confusion is likely, . . . but the absence of such evidence is not dispositive." *Goss*, 6 F.3d at 1393 (citing *Nutri/System, Inc. v. Con-Stan Indus.*, 809 F.2d 601, 606 (9th Cir. 1987); *Eclipse Assocs. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)). "To constitute trademark infringement, use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product." *Entrepreneur Media*, 279 F.3d at 1151 (citing *Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996)). "That there are a few consumers who do not pay attention to obvious differences, and assume common sources where most other people would not, may not demonstrate the requisite likelihood of confusion." *Id.* Though not required, survey evidence may be helpful in establishing actual confusion. *Billfloat Inc. v. Collins Cash Inc.*, Nos. 23-15405, 23-15470, __ F.4th __, 2024 U.S. App. LEXIS 15976, 2024 WL 3242622, at *9 (9th Cir. July 1, 2024)

"Proving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Sleekcraft*, 599 F.2d at 352. *See also Carter-Wallace, Inc. v. P&G Co.*, 434 F.2d 794, 800 (9th Cir. 1970) (noting that complaint letters are not evidence of actual confusion); *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 673 F. Supp. 3d 1017, 1032 (D. Ariz. 2023) (noting that 236 logged calls were merely *de minimis* evidence of isolated incidents of confusion because hundreds of thousands of consumers were exposed to the situation that created the potential for confusion). *Cf. Playboy Enters. v. Netscape Communs. Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004) (holding that an expert report showing actual confusion in at least 20% of consumers was sufficient to preclude summary

[12] There is no evidence that Defendants continue to do so.

judgment).

It is important to be precise about the type of confusion that trademark law seeks to prevent because not all confusion offends trademark law. The relevant confusion is whether members of the buying public would mistakenly purchase one party's product because they believed it to be the other party's product. *James R. Glidewell Dental Ceramics v. Keating Dental Arts, Inc.*, No. SACV 11-1309-DOC(ANx), 2013 U.S. Dist. LEXIS 24824, 2013 WL 655314, at *28 (C.D. Cal. Feb. 21, 2013) (citing *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1126 (C.D. Cal. 2003)). *See also Sunenblick v. Harrell*, 895 F. Supp. 616, 631 (S.D.N.Y. 1995) (citing *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991)) ("[T]he relevant confusion to be avoided is that which affects purchasing decisions, and not confusion generally."). Mistaken inquiries about affiliation which are easily clarified do not constitute evidence of actual confusion for the purposes of the *Sleekcraft* test. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 n.7 (9th Cir. 2002) (citing *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1451 (9th Cir. 1988)) (explaining that, standing alone, evidence showing inquiries about the relatedness of two parties is not sufficient to show actual confusion).

Plaintiff claims that it has "received misdirected communications . . . that were clearly intended to be directed to Defendants." Pl.'s Mot. for Summ. J. 13, ECF No. 93. As supporting evidence, Plaintiff cites Wilkerson's declaration, which reads as follows:

> I have received communications from third parties who I believe to have been likely directed to Defendants. Specifically, I have received emails and phone calls complaining about my company's security guards at the Santa Fe Springs Swap Meet. However, my company has never provided security guards to the Santa Fe Springs Swap Meet. It was not until discovery in this case when I confirmed that Defendants provided security to the Santa Fe Springs Swap Meet that I confirmed my belief that the communications I received were likely intended to be directed to Defendants.

Wilkerson Decl. ¶ 43, ECF No. 93-4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

Defendants argue that Plaintiff has failed to introduce evidence of actual confusion because it "relies solely upon hearsay relating to one event." Defs.' Opp'n to Pl.'s Mot. for Summ. J. 15, ECF No. 98. Defendants' hearsay argument is wrong. "[A]t summary judgment[,] a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Bev. Co.*, 828 F.3d at 1110. Wilkerson could testify at trial that he had received misdirected communications; therefore, the Court can consider his declaration evidence that he received those communications at the summary judgment stage. However, as Defendants point out, Wilkerson's declaration only describes a single incident of mistaken communications which could be easily rectified. Such misdirected communications are not the sort of actual confusion that this *Sleekcraft* factor is meant to capture. The Court, following clear guidance from the Ninth Circuit, construes the absence of evidence of actual confusion as a neutral factor in its *Sleekcraft* analysis. *JL Bev. Co.*, 828 F.3d at 1111 (citing *Sleekcraft*, 599 F.2d at 353).

#### 5. Similarities in the Marketing Channels Used Slightly Support a Likelihood of Confusion

"In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130 (citing *Nutri/System*, 809 F.2d at 606). "Marketing channels can converge even when different submarkets are involved so long as 'the general class of . . . purchasers exposed to the products overlap.'" *Id.* (quoting *Sleekcraft*, 599 F.2d at 353).

Plaintiff argues that both parties use the same marketing channels because "both parties market their services using online marketing channels through competing websites." Pl.'s Mot. for Summ. J. 13–14, ECF No. 93. Defendants fail to counterargue in their opposition to Plaintiff's motion; rather, they improperly claim that "[t]he opposition to the separate statement explains why the two companies do not have competing websites and pursue different clients." [13] Defs.' Opp'n to Pl.'s Mot. for Summ. J. 15–16,

[13] "[E]xplanation and argument belong in the responsive motion, not in the statement of facts." *Puckett v. United States*, No. CV-21-01453-PHX-SMB, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 215805, 2023 WL 8436565, at *9 (D. Ariz. Dec. 5, 2023).

: 

Initials of Preparer PMC

ECF No. 98. Regardless, Defendants' opposition to Plaintiff's separate statement of undisputed facts merely claims that "MIB Security Group and MIB Group do not compete for the same customers." UF 66, ECF No. 112. As support for the existence of this dispute, Defendants cite the same portion of Aguilar's deposition which the Court already evaluated in its discussion of the *Sleekcraft* factor for proximity of the goods. Having disregarded that claim above, the Court disregards it here for the same reason. *See* Section V-C-2 *supra.*

In and of itself, the fact that both parties market online is worth very little. For better or for worse, to market at all in the modern economy is to market on the internet. *See Playboy*, 354 F.3d at 1028 ("PEI and the advertisers use identical marketing channels: the Internet. . . . Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."); *Network Automation*, 638 F.3d at 1151 ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

However, there is more overlap between the marketing strategies than a mere shared use of the Internet. Both parties maintain similar websites advertising their services. Kinder Decl., Ex. 65 (Defs.' Website) & Ex. 103 (Plaintiff's Website), ECF No. 93-3. These websites share similar styles and designs. Beyond the websites, both parties appear to advertise via branded merchandise. Defs.' Mot. for Summ. J., Aguilar Decl. ¶ 11, ECF No. 91 (MIB Security Group has allegedly "spent tens of thousands of dollars promoting the name MIB Security Group and its website through marketing to the public, networking events, swag items (i.e., t-shirts, coffee mugs, key chains, jackets, etc.), and employee uniforms."); Trial Tr. April 16, 2024, at 45:9–46:18 (Wilkerson describing custom MIB jackets and cars). These similarities suggest some shared marketing channels, which slightly supports a likelihood of confusion.

**6. There is No Evidence in the Record Related to the Degree of Customer Care; This Factor is Therefore Neutral**

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353 (citing *HMH Publishing Co. v. Lambert*, 482 F.2d 595, 599 n. 6 (9th Cir. 1973)). "Although the wholly indifferent may be excluded . . . the standard includes the ignorant and the credulous." *Id.* (citing *Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348, 358 (9th Cir. 1948)). "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." *Id.* (citing *American Drill Bushing Co. v. Rockwell Mfg. Co.*, 342 F.2d 1019, 1019 (C.C.P.A. 1965)). "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Id.* (citing *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)). Conversely, "[c]onsumer care for inexpensive products is expected to be quite low." *Playboy*, 354 F.3d at 1028 (citing *Brookfield*, 174 F.3d at 1060). But "[n]o clear standard exists for analyzing moderately priced goods, such as non-designer clothing." *Trader Joe's Co. v. Trader Joe's United*, No. 2:23-cv-05664-HDV-MARx, 2024 U.S. Dist. LEXIS 15511, 2024 WL 305697, at *18 (C.D. Cal. Jan. 12, 2024) (quoting *Surfvivor*, 406 F.3d at 634).

Plaintiff fails to make a proper argument regarding this factor. Instead, it asserts that "both parties deploy security guards that must wear identifying patches bearing the MIB trademark," and therefore even a highly prudent consumer would have no reason to assume that Defendants' employees were not Plaintiff's employees. Pl.'s Mot. for Summ. J. 14, ECF No. 93. Individuals encountering security guards out and about are not the individuals making purchasing decisions regarding which security firm to hire. Plaintiff's argument contains no reference to the cost of security services or how that cost would impact consumer care. Defendant is therefore correct in its counterargument that "MIB Group argues this element weighs in MIB Group's favor but does not explain why, which makes this argument meaningless." Defs.' Opp'n to Pl.'s Mot. for Summ. J. 16, ECF No. 98. Despite recognizing Plaintiff's failure on this prong of the argument, Defendants fail to take the opportunity to argue to the Court that this factor should favor a finding of no likelihood of confusion. Absent relevant evidence from either side, the Court concludes that this factor is analytically neutral.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

**7. Although Not of Great Analytical Importance, Defendant's Intent to Appropriate Plaintiff's Mark Supports a Likelihood of Confusion**

An intent to copy or appropriate is not required to establish a likelihood of confusion. *GoTo.com*, 202 F.3d at 1208. The Ninth Circuit has characterized a defendant's intent as being of only "minimal importance" to the likelihood of confusion analysis. *Id.* (citing *Brookfield*, 174 F.3d at 1059). With that said, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354 (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157–58 (9th Cir. 1963)).

Plaintiff argues that "the Court may presume Defendants['] intent to deceive because Aguilar was not only a former employee, but Defendants also illegally performed services under Plaintiff's PPO License and used (and continue to use) trademarks that were not just similar, but identical in terms of stylization and logo elements, to those of Plaintiff." Pl.'s Mot. for Summ. J. 15, ECF No. 93. Defendant characterizes these arguments as "in the left field," claiming that "[t]here is no evidence to even remotely support this argument, and the jury's finding about the employee issue related to MIB 220, Inc. and MIB 2nd II None, Inc. – not MIB Group." Defs.' Opp'n to Pl.'s Mot. for Summ. J. 16, ECF No. 98. Defendants' attempts to parse the various iterations of corporate identities that operated under the MIB name is unpersuasive; the uncontroverted evidence in the record is that Wilkerson was the sole owner of all of these companies – with the exception of MIB Shield, which Aguilar started after working for one of Wilkerson's predecessor MIB companies.[14] His choice of name is obviously not a coincidence. For this reason, the Court finds that this factor weighs in Plaintiff's favor but does not assign much importance to it in light of the Ninth Circuit's guidance.

---

[14] The jury specifically found that Aguilar "was acting as an employee of M.I.B. 220 Inc. or M.I.B. 2nd II None, Inc. at the time he registered the domain name 'mibsecuritygroup.com.'" Verdict Form, ECF No. 84.

: 

Initials of Preparer PMC

**8. The Likelihood of Expansion Factor is Insignificant Because the Parties are Direct Competitors**

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (citing Restatement of Torts § 731(b) & Comment c). Like evidence of a defendant's intent to confuse customers, "evidence of product expansion is not required for a finding of likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1132 (citing *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011)). "Where two companies are direct competitors, this factor is unimportant." *Network Automation*, 638 F.3d at 1153 (citing *Brookfield*, 174 F.3d at 1060)).

Plaintiff argues that this factor is unimportant because the parties are direct competitors. Defendants dispute that the parties are direct competitors, once again citing the statement of facts. For the reasoning outlined in Section V-C-2, the Court rejects Defendants' counterargument. Because the parties are direct competitors, this factor carries no analytical significance.

**9. Weighing the *Sleekcraft* Factors**

The *Sleekcraft* factors are not mechanically tallied. *See Pom Wonderful*, 775 F.3d at 1132 ("Sheer numerosity of Sleekcraft factors, however, is not by itself dispositive of the ultimate likelihood-of-confusion determination."); *Network Automation*, 638 F.3d at 1154 (tailoring the court's focus to specific *Sleekcraft* factors "[g]iven the nature of the alleged infringement here"). Moreover, the *Sleekcraft* factors are not exhaustive. *Network Automation*, 638 F.3d at 1153–54 (citing *Sleekcraft*, 599 F.2d at 348 n.11).

Not a single *Sleekcraft* factor weighs against a likelihood of confusion; all factors either support a likelihood of confusion or are neutral. Based on the facts of this case, the most significant *Sleekcraft* factors are the proximity of the goods and the similarity of the marks—both of which strongly support a likelihood of confusion. Pursuant to this analysis, no reasonable jury could fail to find a likelihood of confusion here. Accordingly, this case is one of the rare cases where a finding of likelihood of confusion is appropriate at the summary judgment stage. *Cf. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

*Mgmt.*, 618 F.3d 1025, 1039 (9th Cir. 2010) (explaining that summary judgment on likelihood of confusion should not be granted "in cases in which a majority of the *Sleekcraft* factors could tip in either direction").

**D. Despite a Presumptive Application of Laches, Both the *E-Systems* Factors and Defendants' Unclean Hands Prevent Invocation of Equitable Relief**

The parties' briefs imprecisely distinguish the application of laches to the legal theories in this case. For analytical precision, the Court considers the laches argument as it relates to Plaintiff's claims for (1) trademark infringement and (2) cybersquatting.

**1. Trademark Infringement**

"The affirmative defense of laches 'is an equitable time limitation on a party's right to bring suit, which is derived from the maxim that those who sleep on their rights, lose them.'" *Eat Right Foods, Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2017) (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (per curiam)). "Finding that laches bars a trademark claim is appropriate where 'the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time.'" *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000)).

The Ninth Circuit uses "a two-step process" to analyze whether a party is equitably entitled to assert laches in a trademark case. *Ramirez v. Navarro*, No. 23-55112, 2024 U.S. App. LEXIS 10419, 2024 WL 1874993, at *2 (9th Cir. Apr. 30, 2024) (citing *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 878 (9th Cir. 2014)). First, courts are to analyze the timeliness of the plaintiff's suit relative to the analogous state law statute of limitations; based on that analysis, a court determines whether laches presumptively applies. *Id.* (citing *Pinkette Clothing, Inc. v. Cosm. Warriors, Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018)). "Second, we assess the equity of applying laches using what have become known as the *E-Systems* factors: '(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition

:

Initials of Preparer PMC

between senior and junior users; and (6) extent of harm suffered by junior user because of senior user's delay.'" *Id.* (quoting *Pinkette*, 894 F.3d at 1025).

Defendants argue that Plaintiff's trademark infringement claims should be equitably barred by the doctrine of laches. Defs.' Mot. for Summ. J. 14–17, ECF No. 91. Specifically, Defendants argue that "Aguilar believes Wilkerson decided to wait eight years for MIB Security Group to 'get big' and then try to take the name MIB Security Group, the Domain Name and, with it, the outstanding reputation and strong brand recognition for security services." *Id.* at 16. In evaluating this argument, the Court follows the Ninth Circuit's two-step analysis.

**a. Step One: Evaluating Delay in Light of the Relevant California Statute of Limitations**

"Although laches is distinct from a statute of limitation, we make laches determinations 'with reference to the limitations period for the analogous action at law.'" *Eat Right Foods*, 880 F.3d at 1115 (quoting *Jarrow Formulas Inc. v. Nutrition Now Inc.*, 304 F.3d 829, 835–36 (9th Cir. 2002)). "If the plaintiff filed within that period, there is a strong presumption against laches. If the plaintiff filed outside that period, the presumption is reversed." *Id.* (quoting *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006)). In California, the statute of limitations for trademark infringement is four years; the Court will therefore use a four-year benchmark in its laches analysis. *Internet Specialties W., Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 990 n.2 (9th Cir. 2009) ("Neither party disputes the imputation of the four-year limitations period from California trademark infringement law, and we agree that this was the correct period to use.").

"Determining whether a delay was unreasonable requires answering two questions: how long was the delay, and what was the reason for it?" *Eat Right Foods*, 880 F.3d 1109, 1116 (9th Cir. 2017) (quoting *Jarrow Formulas*, 304 F.3d at 838). "To measure the length of a delay, we start the clock 'when the plaintiff knew (or should have known) of the allegedly infringing conduct,' and we stop it when 'the lawsuit in which the defendant seeks to invoke the laches defense' is initiated." *Id.* (citing *Evergreen*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

*Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)).

The Court begins by measuring the length of the delay. The present suit was filed on August 9, 2023. Appling California's four-year statute of limitations for trademark infringement, laches presumptively applies if Plaintiff knew or should have known of Defendants' alleged infringement prior to August 9, 2019.

Defendants argue that Plaintiff knew or should have known of Defendants' alleged infringement in June 2015, "when Wilkerson and Aguilar had a 'falling out' in their business and personal relationships." Defs.' Reply ISO Mot. for Summ. J. 6, ECF No. 109. At that time, Wilkerson demanded that Aguilar turn over control of the website "mibsecuritygroup.com." Defs.' Mot. for Summ. J. Ex. 7 (Emails Between Wilkerson and Aguilar on June 11, 2015), ECF No. 94-5. Aguilar refused to do so. Defs.' Mot. for Summ. J., Aguilar Decl. ¶ 4, ECF No. 92. Aguilar claims that Wilkerson knew of Aguilar's refusal and knew that Aguilar continued to operate under the MIB Security Group name going forward. *Id.* ¶¶ 5–7. Plaintiff counters that Wilkerson had no reason to know that Aguilar was doing anything more than passively holding onto the website domain. Reply ISO Pl.'s Mot. for Summ. J. 22, ECF No. 111. Instead, Plaintiff argues that "the infringement at issue here did not arise until May 2021 when Aguilar began promoting a competing security company under the PPO 121046 license with the launch of the NEW Website that included willfully infringing trademarks." Pl.'s Opp'n to Defs.' Mot. for Summ. J. 12, ECF No. 101.

Here, the parties misunderstand the determinative question; control of the website is only relevant insofar as it relates to **whether Wilkerson knew or should have known that Aguilar was infringing on his trademarks**. And the evidence in the record suggests that Wilkerson should have known that Aguilar was infringing. For example, Wilkerson testified that the parties' relationship imploded because he discovered that Aguilar was falsely holding himself out as "the owner-operator" of MIB. Trial Tr. April 16, 2024, at 73:13–16, ECF No. 106. Aguilar did so with a business card that used both Wilkerson's security services license numbers and the MIB crosshairs logo. *Id.* at 74:1–75:8. Moreover, Plaintiff knew or should have known that Aguilar was using the website to promote his own services. Aguilar testified

:

Initials of Preparer PMC

that he altered the website in 2015 to remove references to Wilkerson. Trial Tr. April 17, 2024, at 48:13–21, ECF No. 107. That alteration undermines Plaintiff's argument that Aguilar was merely holding onto the website in a passive capacity out of spite. Clearly, Aguilar was using the website for his own purposes before he updated it with a new design in 2021. *Id.* at 49:18–50:5. Because Wilkerson knew that Aguilar was holding himself out as the owner-operator of MIB in 2015, and because the MIB website was easily accessible via the Internet, and because Wilkerson claims that Aguilar was denying him access to a website Wilkerson claims to have owned, Wilkerson must have or should have looked at the website and discovered that Aguilar was infringing at some point far before the statute of limitations period expired in 2019. All of these facts support the conclusion that Wilkerson had constructive knowledge of Aguilar's infringement back in 2015. *Eat Right Foods*, 880 F.3d at 1116 (collecting cases for the proposition that the Ninth Circuit has "held that laches barred an otherwise meritorious trademark or copyright claim because the plaintiff had constructive knowledge of potentially infringing activity outside the limitation period" on multiple occasions). For that reason, the Court agrees with Defendants that 2015 is the appropriate start date for evaluating the delay in bringing this case; however, the Court starts the clock in August 2015 (as opposed to June 2015) because that is when the Website was changed to remove Wilkerson's information.

Applying California's four-year statute of limitations to this August 2015 start point, Plaintiff should have brought their lawsuit before August 2019. But Plaintiff did not bring this suit until August 2023 – four years late. Because Plaintiff's suit is untimely, laches presumptively applies. However, that presumption can be discarded if the six *E-Systems* factors do not support the application of laches to the particular case.

**b. Step Two: *E-Systems* Equitable Considerations**

After considering whether laches presumptively applies based on the analogous state statute of limitations, the Court must consider six equitable factors before actually applying laches: "(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users;

and (6) extent of harm suffered by junior user because of senior user's delay." *Pinkette*, 894 F.3d at 1025 (quoting *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)).

### i. Strength and Value of Trademark Rights Asserted

If a plaintiff's mark is "strong and valuable," this factor "weighs against applying laches." *Pinkette*, 894 F.3d at 1027. As explained above in the Court's likelihood of confusion analysis, MIB is a suggestive mark. *See Revelry Vintners, LLC v. MacKay Rest. Mgmt. Grp., Inc.*, No. 4:21-CV-5110-TOR, 2024 U.S. Dist. LEXIS 115897, 2024 WL 3261187, at *26 (E.D. Wash. July 1, 2024) ("The Court resolved above the first factor, strength of Plaintiff's mark, and will not rehash it here."). Suggestive marks are entitled to a degree of protection, although that protection is weak without further evidence related to marketing expenditures, consumer recognition, etc. Here, the record does not contain any meaningful evidence to augment the strength of Plaintiff's MIB mark. The Court concludes that Plaintiff's mark is therefore entitled to some protection; this factor therefore somewhat weighs against an application of laches.

### ii. Plaintiff's Diligence in Enforcing Mark

Next, the Court evaluates whether Plaintiff was justified in waiting to bring this suit. "To determine whether a delay is reasonable, we 'look to the cause of the delay.'" *Eat Right Foods*, 880 F.3d at 1117 (quoting *Evergreen*, 697 F.3d at 1227). "Reasonable justifications for a delay include exhausting remedies through administrative processes, evaluating and preparing complicated claims, and determining 'whether the scope of proposed infringement will justify the cost of litigation.'" *Id.* (quoting *Evergreen*, 697 F.3d at 1227). "'[D]elay is impermissible,' on the other hand, 'when its purpose or effect is to capitalize on the value of the alleged infringer's labor by determining whether the infringing conduct will be profitable.'" *Id.* (quoting *Evergreen*, 697 F.3d at 1227).

As discussed above, Plaintiff argues that it delayed because it had no reason to suspect that Aguilar was conducting business under the MIB name. While Plaintiff does not explicitly make the argument, this reasoning comes close to invoking the two exceptions to the application of laches in the trademark context: "Had defendant's encroachment been minimal, or its growth slow and steady, there would be no laches."

*E-Systems*, 720 F.2d at 607 (citing *Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1154 (9th Cir. 1982); *Carter-Wallace, Inc. v. Procter & Gamble Company*, 434 F.2d 794, 803 (9th Cir. 1970)). However, for the same reasons explained above, Plaintiff should have known about Aguilar's encroachment significantly earlier. Moreover, because Plaintiff believed that Aguilar was wrongly using its name and licenses to conduct business while associated with Plaintiff, it should have confirmed that he had ceased to do so once Plaintiff terminated its relationship with him. The fact that Aguilar continued using the MIB name can hardly be considered minimal or slow encroachment. For these reasons, this factor favors the application of laches.

#### iii. Factors Three and Five: Harm to Senior User if Relief is Denied & Competition Between Senior and Junior Users

As discussed above, Plaintiff and MIB Shield are direct competitors in the market for security services. Allowing MIB Shield to use a mark that is nearly indistinguishable from Plaintiff's mark certainly harms Plaintiff. These factors weigh against the application of laches.

#### iv. Good Faith Ignorance by Junior User

As discussed above, Aguilar did not begin using MIB in good faith. As a previous employee of one (or more) of Wilkerson's various MIB businesses, he was well aware of Wilkerson's use of the mark. This factor weighs against the application of laches.

#### v. Prejudice to Junior User

"Two types of prejudice can give rise to laches: expectations-based prejudice and evidentiary prejudice." *Eat Right Foods*, 880 F.3d at 1119.

"Expectations-based prejudice exists where a defendant took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Id.* (internal quotations omitted) (citing *Evergreen*, 697 F.3d at 1227). "A defendant can establish prejudice by demonstrating that during the

plaintiff's delay, it invested money to expand its business or entered into business transactions based on [its] presumed rights in a disputed mark." *Id.* (internal quotations and alterations omitted) (citing *Miller v. Glenn Miller Prods.*, 454 F.3d 975, 999 (9th Cir. 2006)). "The defendant may also prove prejudice if as a result of entering into such business transactions it may incur liability for damages." *Id.* (internal quotations and alterations omitted) (citing *Miller*, 454 F.3d at 1000; *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984)). "Establishing undue prejudice requires that the defendant show 'at least some reliance on the absence of a lawsuit.'" *Id.* (quoting *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010)). "[T]he prejudice inquiry is concerned with actions a defendant took during the plaintiff's delay in bringing suit—not all the actions it took in relation to the use of a mark." *Id.* at 1119–20 (citing *Miller*, 454 F.3d at 999). "Thus, only expenditures made after a plaintiff 'knew or should have known about the potential claim' will support a finding of expectations-based prejudice." *Id.* at 1120 (quoting *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000)).

"Evidentiary prejudice exists where a plaintiff's delay has led to 'lost, stale, or degraded evidence, or witnesses whose memories have faded, or who have died.'" *Eat Right Foods*, 880 F.3d at 1120 (quoting *Evergreen*, 697 F.3d at 1227).

Here, Defendants only invoke expectations-based prejudice; the Court therefore will not consider evidentiary prejudice. Defendants cite Aguilar's declaration to establish the ways in which they spent time and money developing their business. Aguilar's declaration claims that his company "and the name MIB Security Group have exploded in a good way in the professional security field." Defs.' Mot. for Summ. J., Aguilar Decl. ¶ 8, ECF No. 91. MIB Security Group "is regularly retained by 'high profile' clients, including actors, politicians, musicians, high-net-worth individuals, and celebrities." *Id.* MIB Security Group has allegedly "spent tens of thousands of dollars promoting the name MIB Security Group and its website through marketing to the public, networking events, swag items (i.e., t-shirts, coffee mugs, key chains, jackets, etc.), and employee uniforms." *Id.* ¶ 11. And Aguilar himself claims to have "personally spent hundreds of hours promoting the name MIB Security Group to the public from 2015 to the present through networking events, meetings, interviews, etc." *Id.* ¶ 12.

:

Initials of Preparer PMC

Plaintiff cites to *Internet Specialties W., Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985 (9th Cir. 2009), to argue that Defendants have failed to show prejudice. But Plaintiff misunderstands that case's analysis. In *Internet Specialties*, the Ninth Circuit affirmed a district court's finding of no prejudice because the "uncontested evidence at trial" showed that the form of advertising on which defendant spent its money "creates little to no brand awareness" and because "the company . . . does not even use the ISPWest mark in its most prevalent form of advertising." *Id.* at 992. The determinative question to the prejudice inquiry is whether the defendant made "an investment in the mark . . . as the identity of the business in the minds of the public." *Id.* Focusing the inquiry in that way avoids the following outcome: "If this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay." *Id.* at 991–92 (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965)).

Here, Defendants have introduced evidence of the type of brand-promotion expenditures which satisfy the prejudice test. Most significantly for this analysis, MIB Security Group has allegedly "spent tens of thousands of dollars promoting the name MIB Security Group and its website through marketing to the public, networking events, swag items (i.e., t-shirts, coffee mugs, key chains, jackets, etc.), and employee uniforms." Defs.' Mot. for Summ. J., Aguilar Decl. ¶ 11, ECF No. 91. This evidence suggests that Defendants will suffer prejudice if laches is not applied; accordingly, this factor weighs in favor of laches.

#### vi. Weighing the *E-Systems* Factors

Some *E-Systems* factors favor the application of laches while others do not. In weighing these factors, the Court assigns the greatest weight to Plaintiff's unreasonable delay, Defendants' lack of good faith, and prejudice to Defendants. Ultimately, the Court finds that it would be the greater injustice to preclude Plaintiff's suit. The Court finds laches inapplicable to the present suit.

### c. In the Alternative, Defendants Cannot Invoke Laches Because of Their Unclean Hands

"A party with unclean hands may not assert laches." *Pinkette*, 894 F.3d at 1029 (quoting *Jarrow Formulas*, 304 F.3d at 841). A party's hands need not be "clean as snow" to avoid a finding of unclean hands. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). "[O]nly a showing of wrongfulness, willfulness, bad faith, or gross negligence, proved by clear and convincing evidence, will establish sufficient culpability for invocation of the doctrine of unclean hands." *Pinkette Clothing*, 894 F.3d at 1029 (alterations omitted) (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357, 359 (9th Cir. 1982)). Such a showing must be supported by "clear and convincing evidence." *Id.*

As is relevant here, "[t]he willful infringement exception . . . bars a laches defense . . . if Defendant acted 'with knowledge that its conduct constituted trademark infringement.'" *Anhing Corp. v. Thuan Phong Co.*, No. CV 13-05167 BRO (MANx), 2015 U.S. Dist. LEXIS 97019, 2015 WL 4517846, at *19 (C.D. Cal. July 24, 2015) (alterations omitted) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 957 (9th Cir. 2001)); *see also Herman Miller, Inc. v. Alphaville Design, Inc.*, No. C 08-03437 WHA, 2009 U.S. Dist. LEXIS 103384, 2009 WL 3429739, at *23 (N.D. Cal. Oct. 22, 2009) (citing *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1216-17 (9th Cir. 2003)) ("Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark."); *see also Chloe SAS v. Sawabeh Info. Servs. Co.*, No. CV 11-04147 MMM (MANx), 2015 U.S. Dist. LEXIS 186838, 2015 WL 12763541, at *23 (C.D. Cal. June 22, 2015) (collecting cases). For a more precise articulation, courts can look to the "nearly identical" willfulness standard used in copyright claims. *Atari Interactive v. Redbubble, Inc.*, 546 F. Supp. 3d 883, 886 (N.D. Cal. 2021). That copyright standard requires "substantial evidence '(1) that the [the infringing party] was actually aware of the infringing activity, or (2) that the [infringing party's] actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 748 (9th Cir. 2019) (quoting *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017)). District courts have inferred willfulness "from evidence showing a defendant acted with 'an aura of indifference' to a plaintiff's trademark rights, or with willful blindness to facts she had cause to suspect would put her on notice that she was infringing another's trademarks." *Bikila v. Vibram USA Inc.*, 218 F. Supp. 3d 1206, 1212 (W.D. Wash. 2016) (citing *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007)).

:

Initials of Preparer PMC

Here, the exact same set of facts that points to Plaintiff's undue delay in bringing this case also necessitates the inference of willful infringement. Aguilar falsely held himself out to be an owner-operator of MIB, leading to his schism with Wilkerson. Aguilar refused to restore Wilkerson's access to the MIB website. And most significantly, there is simply no scenario in which a departing employee begins a new business with a nearly identical name to his previous employer without intended to infringe that employer's trademark rights. The evidence in the record unequivocally supports this conclusion. Plaintiff has shown by clear and convincing evidence that Defendants acted with wrongfulness, willfulness, and bad faith. For that reason, Defendants cannot invoke laches.

**2. Cybersquatting**

The Lanham Act was amended in 1999 by the Anticybersquatting Consumer Protection Act, which adding two new causes of action aimed at cybersquatting. *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 549–50 (9th Cir. 2013) (citing *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005)). "Cybersquatting can be understood as registering a domain name associated with a protected trademark either to ransom the domain name to the mark holder or to divert business from the mark holder." *Id.* at 549 n.3 (citing *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005)). "Courts in this circuit have relied on the statute of limitations for state law trademark claims when determining whether plaintiff delayed in asserting a cybersquatting claim." *Universal Life Church Monastery Storehouse v. King*, No. C19-0301RSL, 2020 U.S. Dist. LEXIS 229455, 2020 WL 7181062, at *14 (W.D. Wash. Dec. 7, 2020) (citing *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp.2d 1023, 1035 (C.D. Cal. 2010)). As discussed above, the relevant statute of limitations period for California trademark claims is four years.

Because cybersquatting claims are rooted in the Lanham Act, the Court's previous analysis applies. While laches presumptively applies because of Plaintiff's delay in bringing this case, both the *E-Systems* factors and Defendants' unclean hands prevent the Court from applying laches. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010) (explaining that an ex-employee could not reasonably believe that he could lawfully use his former employer's website domain once he no longer worked for that

employer, regardless of the fact that the employee initially registered his employer's website under the employee's name); *Hidden Empire Holdings, LLC v. Angelone*, No. CV 22-6515-MWF (AGRx), 2022 U.S. Dist. LEXIS 212885, 2022 WL 17080131, at *32 (C.D. Cal. Sep. 30, 2022) ("Several courts have been faced with similar circumstances, and in all cases identified, the courts have uniformly rejected attempts by disgruntled former employees/partners/contractors to claim ownership over domains they registered on behalf of their employers, both in the context of conversion claims as well as cybersquatting claims.").

**E. Plaintiff is Entitled to Summary Judgment in its Favor on its Trademark Claims**

In order to prevail on its federal trademark claims, a plaintiff "must establish both (1) that it has a protected interest (or trademark right)" in the mark allegedly infringed by a defendant, and (2) that a defendant's "usages are likely to cause consumer confusion and thus infringe upon that interest." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820-22 (9th Cir. 1980)).

Pursuant to the analysis above, Plaintiff has successfully established both requirements: (1) No jury could fail to find a likelihood of confusion between the marks in question, and (2) Plaintiff owns the marks in question through Wilkerson. Moreover, laches does not bar this claim despite Plaintiff's delay in suing. The Court therefore GRANTS Plaintiff's motion for summary judgment on its federal trademark infringement claims.

**F. Plaintiff is Entitled to Summary Judgment on its Cybersquatting Claim**

"A plaintiff pursuing a cybersquatting claim under the ACPA must show that: (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1219 (9th Cir. 2012) (internal quotations omitted) (citing *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010)).

In light of the analysis above, Plaintiff has clearly satisfied these three elements. (1) Defendants use a domain name which (2) is confusingly similar to Plaintiff's protected marks and (3) Defendants did so with a bad faith intent to profit from the mark.

Defendants make various unpersuasive legal arguments why summary judgment should not be granted to Plaintiff on this claim. Most significantly, Defendants argue that Plaintiff's ACCPA claim is precluded by the fact that the Website domain was registered in 2008, before Plaintiff registered its trademarks with USPTO in 2021. Defendants mischaracterize the ACCPA to state that it "requires the domain name to be registered **after** the trademark registrations." Defs.' Mot. for Summ. J. 22, ECF No. 91 (emphasis in original). Defendants cites no caselaw in support of this argument, and the statutory language does not support it. *See* 15 U.S.C. § 1125(d)(1)(A). Regardless, Plaintiff can pursue its cybersquatting claim for its unregistered marks, thus rendering this argument irrelevant. While "[i]t is not clear from the reading of the statute whether a mark must be formally registered to seek an ACPA claim but controlling caselaw has confirmed that '[u]nregistered trademarks may . . . be entitled to protection under . . . the Anticybersquating Consumer Protection Act.'" *Quatrewave LLC v. De Stefano*, No. CV 20-07237-MWF (PJWx), 2020 U.S. Dist. LEXIS 227234, 2020 WL 10758648, at *12 (C.D. Cal. Dec. 2, 2020) (alterations in original) (quoting *Matal v. Tam*, 582 U.S. 218 at 226 (2017)).

Defendants' other arguments for why they are entitled to summary judgment (standing, statute of limitations, and laches) are unavailing for reasons explained above. The Court therefore GRANTS Plaintiff's motion for summary judgment as to its cybersquatting claim.

### G. Damages

#### 1. Trademark Infringement

Plaintiff seeks statutory damages, profit disgorgement, injunctive relief, and attorney's fees. In so doing, Plaintiff fails to properly categorize its causes of action.

:

Initials of Preparer PMC

**a. Plaintiff Improperly Requests Statutory Damages**

Plaintiff seeks statutory damages under the wrong provision of the Lanham Act. Specifically, Plaintiff seeks $2,000,000.00 under 17 U.S.C. § 1117(c). Pl.'s Mot. for Summ. J. 15, ECF No. 93. But that subsection is specifically limited to cases "involving the use of a counterfeit mark." 15 U.S.C. § 1117(c). Because this was an ordinary trademark infringement case and not a counterfeit goods case, this statutory subsection is inapplicable. The proper remedies are prescribed under § 1117(a), and they include recovery of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." § 1117(a). In "exceptional cases," the Court "may award reasonable attorney fees to the prevailing party." *Id.*

**b. Subject to Equitable Considerations, Plaintiff May Be Eligible for a Disgorgement of Defendants' Profits**

Beyond the inapplicable statutory damages above, Plaintiff also seeks to recover Defendants' profit on its annual revenue of $1,800,000.00 for the year 2023. Pursuant to § 1117(a), "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Here, there is evidence in the record that a "ballpark figure" of Defendants' revenue in 2023 was $1,800,000.00. Kinder Decl., Ex. B (Aguilar Dep.) at 65:2–4, ECF No. 93-3.

Defendants wrongly argue that "to recover damages . . . MIB Group must prove the financial cost of its injury and any lost profits it might have earned absent the infringement." Defs.' Opp'n to Pl.'s Mot. for Summ. J. 16, ECF No. 98. As support for this proposition, Defendants cite *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1220 (9th Cir. 2023). This citation is relevant, but it proves the precise opposite of Defendants' argument. The Lanham Act provides for the recovery of a defendant's profits **and** any damages sustained by the plaintiff. These "two forms of damages are distinct." *Id.* at 1220 n.11. "'Defendant's profits' are a form of disgorgement and are typically calculated based on the infringer's overall gross revenue from the infringement less the infringer's expenses." *Id.* (quoting *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015)). "By contrast, 'any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

damages sustained by the plaintiff' include compensatory damages arising from any 'reasonably foreseeable harms' caused by the wrong." *Id.* (quoting *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012)). Damages arising from a plaintiff's lost business "are necessarily not 'defendant's profits' because they are measured by" a plaintiff's "projected revenue," not by a defendant's "earned revenue from infringement." *Id.*

Here, Plaintiff has only sought disgorgement of Defendants' profits and not actual damages resulting from lost sales. Therefore, pursuant to the plain statutory language of § 1117(a), all Plaintiff must do is introduce evidence of Defendants' revenue. Plaintiff has done so here. For that reason, it is entitled to an award of Defendants' profits. Under the statutory scheme, "[t]he burden then shifts to the defendant to 'prove that sales were demonstrably not attributable to the infringing mark,' or that certain expenses 'should be deducted from the gross revenue to arrive at the . . . lost profits.'" *Stone Creek Inc. v. Omnia Italian Design Inc.*, No. CV-13-00688-PHX-DLR, 2018 U.S. Dist. LEXIS 62663, at *7 (D. Ariz. Apr. 12, 2018) (quoting *Nintendo Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994); *Fifty-Six Hope Rd.*, 778 F.3d at 1076). "If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985) (citing *Russell v. Price*, 612 F.2d 1123, 1130–31 (9th Cir. 1979), *cert. denied*, 446 U.S. 952 (1980); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 207 (1942). Defendants do not challenge Aguilar's estimate of Defendants' 2023 revenues. Defs.' Reply ISO Mot. for Summ. J. 11, ECF No. 109. They also admit that Aguilar's deposition contained "no discussion of net profits," yet they fail to introduce any such evidence alongside either their motion or their opposition to Plaintiff's motion. *Id.* Defendants' misunderstanding of the legal standard resulted in their failing to carry their burden. For that reason, Plaintiff is entitled to the full $1,800,000.00 of Defendants' 2023 revenues, subject to equitable considerations. *See Harry & David v. Pathak*, No. 09-3013-CL, 2010 U.S. Dist. LEXIS 126887, 2010 WL 4955780, at *17 (D. Or. Oct. 29, 2010), *R. & R. adopted*, 2010 U.S. Dist. LEXIS 126891, 2010 WL 4955715 (D. Or. Nov. 30, 2010) (awarding disgorgement of full revenue amount in the absence of evidence of operating costs or other appropriate deductions); *ADG Concerns, Inc. v. Tsalevich LLC*, No. 18-cv-00818-NC, 2018 U.S. Dist. LEXIS 155542, 2018 WL 4241967, at *34 (N.D. Cal. Aug. 31, 2018), *R. & R. adopted*, 2018 U.S. Dist. LEXIS 224801, 2018 WL 6615139 (N.D. Cal. Oct. 31, 2018)

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

(awarding disgorgement of full revenue amount in the absence of operating costs or other appropriate deductions in the context of a motion for default judgment).

"An accounting of profits is never automatic and never a matter of right." *Yuga Labs, Inc. v. Ripps*, No. CV 22-4355-JFW(JEMx), 2023 U.S. Dist. LEXIS 192487, 2023 WL 7089922, at *28 (C.D. Cal. Oct. 25, 2023) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:59 (5th ed.)). Such awards are "subject to the principles of equity." 15 U.S.C. § 1117. "Specifically, those equitable considerations include: (1) 'a defendant's mental state,' such as 'whether the [defendant] had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting [the plaintiff's] rights; (5) the public interest in making the misconduct unprofitable; and (6) whether it is a case of palming off." *Yuga Labs*, 2023 U.S. Dist. LEXIS 192487, 2023 WL 7089922, at *28 (quoting *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2023 U.S. Dist. LEXIS 43066, 2023 WL 2652855, *4 (C.D. Cal. Mar. 13, 2023)). The Court has significant discretion to fashion a disgorgement award. *See* § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

Here, Plaintiff's delay in asserting its own rights weighs in favor of reducing this equitable award. For that reason, the Court reduces the disgorgement amount by 25%, resulting in an award of $1,350,000.00.

**c. Plaintiff is Entitled to Attorney's Fees**

"[D]istrict courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional . . . ." *Sunearth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and

:

Initials of Preparer PMC

the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554. District courts are to use a preponderance of the evidence standard in deciding whether a case was exceptional. *Sunearth*, 839 F.3d at 1181.

"A trademark case is generally considered exceptional for purposes of awarding of attorneys' fees when a party has taken positions that can be characterized as 'malicious, fraudulent, deliberate or willful', or 'groundless, unreasonable, vexatious, or pursued in bad faith.'" *Yuga Labs*, 2023 U.S. Dist. LEXIS 192487, 2023 WL 7089922, at *51 (internal citations omitted) (quoting *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000); *Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 827 (9th Cir. 1997)).

Plaintiff argues that this case was exceptional, and the Court should therefore award attorney's fees, because "Defendants' infringement was willful and illegal." Pl.'s Mot. for Summ. J. 16, ECF No. 93. Defendant does not address this argument in its opposition. Here, Defendants' "willful and brazen infringement," coupled with the strength of Plaintiff's trademark infringement claims, justifies a fee award. *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 (9th Cir. 2023). The Court therefore ORDERS Plaintiff to submit billing records which will enable the Court to determine what constitutes a reasonable fee award.

**d. Injunctive Relief**

Plaintiff also requests that the Court enjoin Defendants from "further infringement." Pl.'s Mot. for Summ. J. 16, ECF No. 93. The Lanham Act authorizes the granting of such an injunction. 15 U.S.C. § 1116.

To secure a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Here, the *eBay* factors support issuing a permanent injunction. Plaintiff is entitled to "a rebuttable presumption of irreparable harm" because the Court has found a Lanham Act violation. § 1116. Defendants have not rebutted this presumption in any way. Given the parties' extensive history, Defendants' conduct, and the need to avoid public confusion, the Court finds that the remaining *eBay* factors likewise support the imposition of an injunction against further infringement.

**e. Punitive Damages Are Not Available for Lanham Act Claims**

Plaintiff also claims to be entitled to an award of punitive damages and proposes a two-day jury trial to fix the amount of those damages. Pl.'s Mot. for Summ. J. 16, ECF No. 93. Plaintiff cites no legal authority justifying the award of punitive damages in this case. Many courts "have held that punitive damages are not recoverable in cases brought under the federal Lanham Act." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:97 (5th ed.). With that said, "punitive damages are still available for accompanying state, nonfederal causes of action for trademark infringement." *Id.*

**2. Cybersquatting**

**a. Statutory Damages**

Plaintiff requests an award of $4,000,000.00 in statutory damages for its cybersquatting claim. Pl.'s Mot. for Summ. J. 16, ECF No. 93. A request for statutory damages is authorized by 15 U.S.C. § 1117(d), although that subsection provides for "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." § 1117(d). "Where 'statutory damages are elected, [t]he court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima.'" *UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 614 (C.D. Cal. 2017) (quoting *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990)). Plaintiff argues that the Court should exceed the $100,000.00 statutory damages cap because Defendants' cybersquatting actions were willful. But Plaintiff cites no legal support for its argument, and the Court therefore declines to exceed the clear statutory maximum.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

Although the ACCPA leaves an award of statutory damages up to the discretion of the district court, "courts generally consider a number of factors in making such determinations." *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C 08-2832 JF (RS), 2009 U.S. Dist. LEXIS 84235, 2009 WL 2706393, at *8 (N.D. Cal. Aug. 25, 2009). Those factors include "the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter--i.e., one who has engaged in a pattern of registering and using a multitude of domain names that infringe the rights of other parties--and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings." *Id.* at *9; *see also Twitch Interactive, Inc. v. Johnston*, No. 16-cv-03404-BLF, 2018 U.S. Dist. LEXIS 184300, 2018 WL 1449525, at *30 (N.D. Cal. Jan. 22, 2018) (citing *Facebook, Inc. v. Banana Ads LLC*, No. CV 11-03619, 2013 U.S. Dist. LEXIS 65834, 2013 WL 1873289, at *15 (N.D. Cal. Apr. 30, 2013), *R. & R. adopted*, 2013 U.S. Dist. LEXIS 203354, 2013 WL 12308477 (N.D. Cal. June 24, 2013)) (considering the following factors: "'the number of domain names registered, whether there was an attempt to conceal the registrant's identity, whether the correct spelling of Plaintiff's trademark is contained in the infringing domain names, whether an individual defendant is a serial cybersquatter, and whether internet traffic was redirected' to a landing website.").

Courts have awarded statutory damages at various points within the statutory range of $1,000.00–$100,000.00. *Digby Adler Grp. LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1108 n.4 (N.D. Cal. 2015) (collecting cases). Courts awarding statutory damages in cases in which a defendant acted willfully, but was not a serial cybersquatter, often opt for a figure in the middle of this range. *See, e.g.*, *Digby*, 79 F. Supp. 3d at 1108 (awarding $25,000.00 in statutory damages against a defendant whose cybersquatting was willful, if not egregious, but whose status as a serial cybersquatter was unclear and who demonstrated no contempt for the proceedings); *Ploom, Inc. v. iPloom, LLC*, No. 13-cv-05813 SC, 2014 U.S. Dist. LEXIS 65204, 2014 WL 1942218, at *22 (N.D. Cal. May 12, 2014) (awarding $50,000.00 in statutory damages against a defendant whose cybersquatting "was both willful and egregious" but was not a serial cybersquatter); *Cloudclinic LLC v. Therapetic Sols, Inc.*, No. 17-CV-1293-JLS (NLS), 2018 U.S. Dist. LEXIS 229469, at *32 (S.D. Cal. May 21, 2018) (awarding $25,000.00 per domain name against a

:

Initials of Preparer PMC

defendant who willfully infringed but was not a serial cybersquatter and voluntarily took down infringing websites).

Here, Defendants' use of the Website domain was willful and egregious. However, there is no evidence that Defendants are serial squatters or that they showed contempt for judicial proceedings. Defendants also only cybersquatted on a single domain. For that reason, the Court awards a middle-of-the-road statutory damages award of $50,000.00.

**b. Injunctive Relief**

Plaintiff also seeks an injunction compelling Defendants to turn over control of the Website. "The ACPA authorizes transfer of offending domain names to the mark owner . . . ." *Bittorrent, Inc. v. Bittorrent Mktg. GmbH*, No. 12-cv-02525-BLF, 2014 U.S. Dist. LEXIS 157593, 2014 WL 5773197, at *45 (N.D. Cal. Nov. 5, 2014) (citing 15 U.S.C. § 1125(d)(1)(C)). Such injunctive relief has been upheld as proper by the Ninth Circuit. *See Vistancia Dev. LLC v. DBD, LLC*, No. 22-16024, 2023 U.S. App. LEXIS 29927, 2023 WL 7411533, at *7 (9th Cir. Nov. 9, 2023) ("Based on this record, the district court also did not abuse its discretion in issuing a permanent injunction against further infringement and requiring DBD to surrender the domain name of its website."). The Court has also found numerous district court cases which have similarly considered and applied injunctions relating to domain ownership, although often in the form of a preliminary injunction. *See Sleep No. Corp. v. Unknown Party*, No. CV-23-00377-PHX-MTL, 2023 U.S. Dist. LEXIS 75363, at *12 (D. Ariz. Mar. 17, 2023) (noting that provisional domain transfer is routinely granted as interim relief in instances of cybersquatting); *Purelight Power, LLC v. Westfall*, No. 1:22-cv-01146-CL, 2022 U.S. Dist. LEXIS 173292, 2022 WL 4464038, at *16 (D. Or. Sep. 26, 2022) (ordering a defendant to cease using a domain name which likely infringed on a plaintiff's trademark, but declining to order the defendant to surrender their domain name until final judgment)

Having found Defendants liable for cybersquatting, the Court ORDERS them to return control of the Website's domain (mibsecuritygroup.com) to Plaintiff.

:

Initials of Preparer PMC

**H. State Claims**

Plaintiff's motion for summary judgment does not explicitly mention, and therefore does not move for summary judgment, on the causes of action alleged under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, or California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

Defendants' motion for summary judgment argues that the Court should grant summary judgment in their favor on these claims because, *inter alia*,[15] "the trial exhibits MIB Group intends to rely upon do not support the existence of any damages." Defs.' Mot. for Summ. J. 23, ECF No. 91. Plaintiff claims that this "argument is incorrect as a matter of law in that Plaintiff does not seek damages under either claim." Pl.'s Opp'n to Defs.' Mot. for Summ. J. 21, ECF No. 101. Instead, Plaintiff only seeks injunctive relief. *Id.*

The Court is not persuaded by Defendants' argument that Plaintiff has failed to show damages. Both "California's UCL and FAL use the same standard to assess injury-in-fact." *Am. Soc'y of Anesthesiologists v. BevMD, LLC*, No. 15-cv-600-BAS(JLB), 2016 U.S. Dist. LEXIS 188184, 2016 WL 4257448, at *14 (S.D. Cal. Mar. 31, 2016) (citing *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 529 (N.D. Cal. 2012)). "Courts have found the diminution to a trademark's value to be a valid economic injury under the UCL." *Id.* at *15 (citing *Overstock, Inc. v. Gradient Analytics, Inc.*, 61 Cal. Rptr. 3d 29 (Cal. Ct. App. 2007)). Because Defendants' infringing use of Plaintiff's trademark inherently diminishes the economic value of that mark, Plaintiff has adequately demonstrated an economic injury. Defendants' motion for summary judgment on Plaintiff's state law causes of action is therefore DENIED.

However, as noted above, Plaintiff has not properly moved for summary judgment on these claims. The Court therefore declines to award summary judgment to Plaintiff. However, the Court believes this decision to be of little consequence. Plaintiff stated that they only seek injunctive relief pursuant to these claims, and the Court has already awarded injunctive relief for Plaintiff's federal trademark claims.

[15] Defendants also make standing and laches arguments, which are rejected for the same reasons expressed above.

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:23-cv-01597-SVW-SHK | Date | July 16, 2024 |
| Title | *The M.I.B. Group LLC v. Steven R. Aguilar et al.* | | |

## VI. Conclusion

For the reasons listed above, Defendants' motion for summary judgment is DENIED. Defendants' arguments regarding the cancellation of Plaintiff's registered marks, Plaintiff's lack of standing, and the application of laches are unpersuasive. Moreover, no reasonable jury could fail to find a likelihood of confusion between its trademarks and Plaintiff's trademarks.

For the reasons listed above, Plaintiff's motion for summary judgment trademark infringement is GRANTED IN PART and DENIED IN PART. Summary judgment is granted in Plaintiff's favor on its federal trademark infringement claims and its cybersquatting claim. The Court is missing key information with which to calculate Plaintiff's damage award, but the outline of that award is presented below:

- Plaintiff is entitled to a disgorgement of Defendants' 2023 profit in the amount of $1,350,000.00.
- Plaintiff is entitled to a reasonable attorney's fee. Plaintiff is ORDERED to submit its counsel's billing records so that the Court can calculate that award.
- Plaintiff is entitled to an injunction preventing Defendants from further infringing on its trademarks. Plaintiff is also entitled to an injunction ordering Defendants to surrender the Website's domain name (mibsecuritygroup.com) to Plaintiff. Plaintiff is ORDERED to submit a proposed injunction in accordance with this Court's order.
- Plaintiff is awarded $50,000.00 in statutory damages for Defendants' cybersquatting.

**IT IS SO ORDERED.**

:

Initials of Preparer PMC